UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——————————

| | |
|---|---|
| JILL and JOSEPH HILE; JESSIE and RYAN BAGOS; SAMANTHA and PHILLIP JACOKES; NICOLE and JASON LEITCH; MICHELLE and GEORGE LUPANOFF; and PARENT ADVOCATES FOR CHOICE IN EDUCATION FOUNDATION (PACE FOUNDATION); | Case No. 21-cv-00829<br><br>Hon. _____ |

Plaintiffs,

v.

STATE OF MICHIGAN; GRETCHEN
WHITMER, GOVERNOR, in her official
capacity; RACHAEL EUBANKS,
MICHIGAN TREASURER, in her
official capacity;

Defendants.

_____/

## COMPLAINT

**This action challenges the
constitutionality of Article 8,
Section 2 of the Michigan
Constitution**

## INTRODUCTION

1.      This is a 42 U.S.C. § 1983 action challenging the constitutionality of

Michigan's Blaine Amendment, Article 8, Section 2, Paragraph 2 of the Michigan

Constitution of 1963, under the First and Fourteenth Amendments to the United

States Constitution.

2.      Section 529 of the Internal Revenue Code allows State-sponsored

savings plans to be created to fund expenses of higher education. Michigan created

such a plan, known as the Michigan's Education Savings Plan (MESP), and allows a

Michigan income-tax deduction for contributions made to an MESP account provided that MESP monies are spent on qualified education expenses.

3.     In December 2017, Congress enacted and the President signed into law the Tax Cuts and Jobs Act, which expanded 529 plans so that they could also be used for K-12 education expenses. This provision facilitates greater school choice by allowing families to use their MESP account for K-12 tuition. Specifically, under the Act, the definition in Section 529 for "qualified higher education expenses" includes up to $10,000 in 529 distributions for tuition at public, private, or religious elementary or secondary schools.

4.     Michigan law defers to Section 529 of the Internal Revenue Code as to what constitutes "qualified higher education expenses" eligible to be funded from an MESP account. Accordingly, as a matter of Michigan statutory law, an MESP owner who is a Michigan taxpayer is entitled to tax benefits (a tax deduction) available under the Michigan Income Tax Act when he or she uses MESP funds for private, religious-school tuition at an elementary or secondary school.

5.     The problem is that Michigan has a constitutional provision, a so-called "Blaine Amendment," that prohibits the use of public funds "to aid any nonpublic elementary or secondary school"—including any "tax benefit" to support a student's attendance at a nonpublic school.

6.     Accordingly, it is widely acknowledged that Michigan's Blaine Amendment, Mich. 1963 Const. Art. VIII, § 2, ¶ 2, prohibits the aforementioned Michigan income-tax deduction when 529 plans are used to pay for private, K-12

tuition. *E.g.*, Citizens Research Council of Michigan, *In Michigan, 'no public aid to private schools' means 'no state tax break for your 529'* (Feb. 2, 2018), https://crcmich.org/in-michigan-no-public-aid-to-private-schools-means-no-state-tax-break-for-your-529.

7.     Plaintiffs Jill and Joseph Hile, Jessie and Ryan Bagos, Samantha and Phillip Jacokes, Nicole and Jason Leitch, Michelle and George Lupanoff, and Parents Advocates for Choice in Education Foundation (PACE Foundation), bring this lawsuit because Michigan's Blaine Amendment violates their rights under the United States Constitution.

8.     First, the federal Free Exercise Clause invalidates government acts motivated by religious animus. *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-534 (1993). Indeed, even a "slight suspicion" of animus is enough to render a government act unconstitutional. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1731 (2018) (affirming the government's "high duty" of neutrality and explaining that even "subtle departures" from that duty cannot stand). Michigan citizens adopted the State's Blaine Amendment in 1970 in response to a modest proposal to appropriate $150 per student in funding for private schools—which were then more than 90% religious—spurred on by an anti-religious ballot sponsor (the "Council Against Parochiaid") and by anti-religious, especially anti-Catholic, advertisements, campaign literature, and letters to the editor.

9.    Second, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam), citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67–68 (2020) (per curiam). And Michigan treats comparable secular activity more favorably than religious exercise when it comes to the use of 529 Plans. There are numerous public-school districts that allow out-of-district residents to attend an in-district school if the student's family pays tuition. Such families are free to use their MESP accounts to pay for that tuition without penalty. Yet families seeking to use their MESP accounts to pay for tuition at a private religious school are penalized by Michigan's Blaine Amendment and would lose their tax exemption.

10.    Third, it is unconstitutional for a state to use a Blaine Amendment to force religious schools and families attending those schools to "divorce" themselves "from any religious control or affiliation" to "be eligible for government aid." *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2256 (2020), quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2202 (2017), and *Sherbert v. Verner*, 374 U.S. 398, 405 (1963). Such coercion "punishes the free exercise of religion," and is also "subject to 'the strictest scrutiny.'" *Id.*, quoting *Trinity Lutheran*, 137 S. Ct. at 2022.

11.    Finally, Michigan's Blaine Amendment violates the Fourteenth Amendment because it requires religious citizens, a suspect class, to surmount a

considerably higher burden than non-religious citizens seeking comparable legislative action. In short, it was designed to be used or likely to be used to encourage infliction of injury by reason of religion, contrary to *Romer v. Evans*, 517 U.S. 620 (1996), *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); and *Hunter v. Erickson*, 393 U.S. 385, 390-393 (1969).

12.     Michigan's Blaine Amendment cannot satisfy strict scrutiny. The Council Against Parochiaid and Michigan's Attorney General have defended the Michigan Blaine Amendment by saying it "safeguards" public schools by ensuring that "government support is not diverted to private schools." *Espinoza*, 140 S. Ct. at 2261. But Michigan allows private, secular schools to obtain public funding by converting to charter-school status. And a "law does not advance 'an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited.'" *Id.*, quoting *Lukumi*, 508 U.S. at 547.

13.     Accordingly, this Court should enjoin the State of Michigan from enforcing the State's Blaine Amendment.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under 42 U.S.C. § 1983, and asserts violations of the First and Fourteenth Amendments of the United States Constitution.

15.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3), declaratory relief under 28 U.S.C. § 2201(a), and attorney fees under 42 U.S.C. § 1988(b).

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of the events or omissions giving rise to the claims occurred in this District.

## THE PARTIES

17.     Plaintiffs Jill and Joseph Hile live in Kalamazoo, Michigan, and are parents of school-age children. They have funded an MESP plan and would like to use it to pay for their children's private, religious-school tuition in Michigan. But if they do so, the State of Michigan will use Michigan's Blaine Amendment to force them to reverse the Michigan tax deduction they received at the time they made the MESP contributions. The Hiles are members of PACE Foundation.

18.     Plaintiffs Jessie and Ryan Bagos live in Royal Oak, Michigan, and are parents of school-age children. They have funded an MESP plan and would like to use it to pay for their children's private, religious-school tuition in Michigan. But if they do so, the State of Michigan will use Michigan's Blaine Amendment to force them to reverse the Michigan tax deduction they received at the time they made the MESP contributions. The Bagoses are members of PACE Foundation.

19.     Plaintiffs Samantha and Phillip Jacokes live in Milford, Michigan, and are parents of school-age children. They have funded an MESP plan and would like to use it to pay for their children's private, religious-school tuition in Michigan. But

if they do so, the State of Michigan will use Michigan's Blaine Amendment to force them to reverse the Michigan tax deduction they received at the time they made the MESP contributions. The Jacokes are members of PACE Foundation.

20.     Plaintiffs Nicole and Jason Leitch live in Charlotte, Michigan, and are parents of school-age children. They have funded an MESP plan and would like to use it to pay for their children's private, religious-school tuition in Michigan. But if they do so, the State of Michigan will use Michigan's Blaine Amendment to force them to reverse the Michigan tax deduction they received at the time they made the MESP contributions. The Leitches are members of PACE Foundation.

21.     Plaintiffs Michelle and George Lupanoff live in Grand Rapids, Michigan, and are parents of school-age children. They have funded an MESP plan and would like to use it to pay for their children's private, religious-school tuition in Michigan. But if they do so, the State of Michigan will use Michigan's Blaine Amendment to force them to reverse the Michigan tax deduction they received at the time they made the MESP contributions. The Lupanoffs are members of PACE Foundation.

22.     Plaintiff Parent Advocates for Choice in Education Foundation (PACE Foundation) is a grassroots coalition of parent advocates who can learn about the need to protect and advance their rights, as well as the potential impact of legislation that could take away or expand education freedoms. Among other things, PACE Foundation has members who desire to use their MESP plans to pay for private, religious-school tuition.

23.     Defendant Gretchen Whitmer is the Governor of Michigan and is sued in her official capacity only.

24.     Defendant Rachael Eubanks is Michigan's Treasurer and is sued in her official capacity only.

## GENERAL ALLEGATIONS

**529 Plans and the Michigan Education Savings Plan**

25.     Section 529 of the Internal Revenue Code allows state-sponsored education savings plans, like Michigan's Education Savings Plan (MESP), which is authorized under the Michigan Education Savings Program Act. The MESP is similar to a Roth Individual Retirement Account in that contributions are invested in mutual funds or other investments in privately owned accounts and allowed to grow, federal tax-free, until they are withdrawn to be used for "qualified higher education expenses."

26.     Under the Michigan Income Tax Act, an MESP account owner who is a Michigan taxpayer, like Plaintiffs, is allowed to deduct from Michigan "taxable income" contributions made by the taxpayer into the MESP account during the relevant tax year. Net contributions cannot exceed a total deduction of $5,000 for a single return or $10,000 for a joint return per tax year.

27.     Both the Michigan Education Savings Program Act and the Michigan Income Tax Act defer to Section 529 of the Internal Revenue Code as to what constitutes "qualified higher education expenses" that are eligible to be funded from the MESP account and still be entitled to preferential tax treatment.

**Federal expansion of 529 Plans to include K-12 tuition expense**

28.     In December 2017, Congress enacted and the President signed into law the federal Tax Cuts and Jobs Act, which expanded 529 Plans so savings could be used for K-12 education expenses. This provision facilitates greater school choice by allowing families to use their savings programs for private-school tuition.

29.     Specifically, under § 11032 of the Act, beginning in 2018, the definition in Section 529 for "qualified higher education expenses" includes up to $10,000 in 529 distributions for tuition at public, private, or religious elementary or secondary schools. So, 529 plans can now finance K-12 education expenses for private-school tuition.

30.     Because Michigan incorporates § 529's definition of "qualified higher education expenses," nothing in the Michigan Education Savings Program Act prevents the owner of an MESP plan from using their MESP funds to pay for private-school tuition and still receiving all the benefits provided under the Michigan Income Tax Act.

31.     Plaintiffs would use their MESP plans to pay tuition for their children's attendance at private, religious schools.

32.     If they do so, the State of Michigan will force Plaintiffs to reverse and pay for the Michigan tax deduction they received at the time Plaintiffs made their MESP contributions.

33.     That is because the Michigan Constitution includes a so-called "Blaine Amendment," which strictly prohibits public monies being used for private-school expenses and expressly prohibits the State from providing any "tax benefit,"

"directly or indirectly, to support the attendance of any student" at a nonpublic school." 1963 Mich. Const. Art. VIII, § 2.

34.    In other words, Michigan's Constitution prevents Plaintiffs from enjoying the current state-tax benefits if they use their 529 accounts for private, religious K-12 tuition as federal law allows. *E.g.*, Citizens Research Council of Michigan, *In Michigan, 'no public aid to private schools' means 'no state tax break for your 529'* (Feb. 2, 2018), https://crcmich.org/in-michigan-no-public-aid-to-private-schools-means-no-state-tax-break-for-your-529.

35.    The Michigan Department of Treasury recognizes this fact. At a December 8, 2020 meeting of the Michigan Education Trust Board, chaired by Defendant Eubanks, the minutes observe that the Board was keeping an eye on a Michigan Supreme Court case involving the appropriation of funds to reimburse private schools for safety and welfare mandates to see if the decision "would have an impact on the use of 529 accounts for K-12 tuition without state tax penalty." https://www.michigan.gov/documents/setwithmet/February_4_2021_Board_Docket_715120_7.pdf.

**The anti-religious origin of Blaine Amendments**

36.    State constitutional amendments prohibiting the use of public funds to support or maintain private religious schools are called "Blaine Amendments" after Congressman and later Senator James G. Blaine of Maine. Toby Heytens, *Note: School Choice and State Constitutions*, 86 Va. L. Rev. 117, 131 (2000) [hereinafter

"*School Choice*"]. In 1875, Blaine proposed an amendment to the U.S. Constitution that sought to bar government aid to sectarian schools and institutions. *Id.*

37.     When Blaine made his proposal, public schools—often described as common schools—were largely Protestant. As one scholar explains, the "common-school curriculum promoted a religious orthodoxy of its own that was centered on the teachings of mainstream Protestantism." Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 Harv. J. L. & Pub. Pol'y 657, 666 (1998) [hereinafter *"Blaine's Wake"*].

38.     Catholic immigrants, who began to arrive in America in waves in the 1800s, "perceived Protestant-controlled public schools as hostile to their faith and values." *School Choice*, 86 V. L. Rev. at 136. And these immigrants began to request governmental financial support for Catholic schools. *Id.*

39.     The public preference for nonsectarian schools was widely understood to be a preference for Protestant schools, as the two concepts were one and the same. Michael W. McConnell, John H. Garvey & Thomas C. Berg, *Religion and the Constitution* 451-456 (2002).

40.     As Justice Breyer has explained, "Catholics sought equal government support for the education of their children in the form of aid for private Catholic schools. But the 'Protestant position' on this matter, . . . was that public schools must be 'nonsectarian' (which was usually understood to allow Bible reading and other Protestant observances) and public money must not support 'sectarian'

11

schools (which in practical terms meant Catholic)." *Zelman v. Simmons-Harris*, 536 U.S. 639, 721 (2002) (Breyer, J. dissenting).

41.     It is now beyond dispute that the Blaine Amendment was largely an anti-Catholic response to the request for public funding for Catholic schools. *E.g.*, *School Choice*, 86 Va. L. Rev. at 138; *Blaine's Wake*, 21 Harv. J. L. & Pub. Pol'y at 659 ("[T]he Blaine Amendment is a remnant of nineteenth-century religious bigotry promulgated by nativist political leaders who were alarmed by the growth of immigrant populations and who had particular disdain for Catholics.").

42.     Blaine's Amendment would have mandated that no federal funds could be used to aid "sectarian" institutions, which was code for Catholic schools. *School Choice*, 86 Va. L. Rev. at 133.

43.     Blaine's Amendment was supported by President Grant and approved by the House of Representatives. It narrowly failed to achieve the two-thirds majority in the Senate necessary for a constitutional amendment. *Id.*

44.     "Consideration of the [Blaine] amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was a code for 'Catholic.'" *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (Thomas, J. joined by Rehnquist, C.J., Scalia, J., and Kennedy, J.).

45.     In the wake of the narrow defeat of the federal Blaine Amendment, "approximately thirty states wrote or amended their constitutions to include language substantially similar to that of" the federal Blaine Amendment. *Id.*

12

46.     Congress made the inclusion of Blaine Amendments a condition of admission to the Union for several states. *Id.*

47.     These state Blaine Amendments were significantly motivated by anti-Catholic religious animus "to make certain that government would not help pay for 'sectarian' (*i.e.,* Catholic) schooling for children." *Zelman*, 536 U.S. at 721 (Breyer, J. dissenting).

**The anti-religious lead up to Michigan's Blaine Amendment**

48.     Michigan was no stranger to this nativist, anti-Catholic, and anti-parochial school zeitgeist.

49.     In 1847, Michigan's State Superintendent of Public Instruction gave a speech, subsequently endorsed by the Michigan Legislature, that Michigan's common schools should inculcate the doctrines of the Sermon on the Mount and the sublime precepts of the Bible. He relied on his listeners' presumed common descent from the Puritans, to unite them in the goal "as Protestants" to encourage the reading of the Scriptures in the common schools.

50.     The speech caused outrage among Catholics, and prompted a call to allow parents to decide where public funds would be spent to educate their children—a precursor to later calls for school vouchers.

51.     By 1900, at least 1 in 20 students attended Catholic parochial schools.

52.     The growth of the parochial schools led to the formation in 1916 of the Wayne County Civic Association whose primary purpose was to defend the public schools and the complete opposition to Parochial schools in Michigan.

53.     The Civic Association was successful in placing an initiative on the November 1920 ballot that would have amended the Michigan Constitution to require all Michigan residents between five and sixteen to attend public school.

54.     While the proposed amendment failed, the Ku Klux Klan and the Public School Defense League successfully petitioned to have a substantively similar initiative put on the 1924 ballot. It too failed at the ballot box.

55.     The message was clear. There was a substantial portion of the Michigan electorate that believed religious schools should be outlawed.

56.     Parents whose children attended religious schools continued efforts to obtain educational parity.

57.     In the late 1950s, State Representative T. John Lesinksi of Detroit authored a bill that would have allowed parochial schools to receive funds from the Michigan State School Fund. That bill was defeated in 1959.

58.     In 1960, a chapter of Citizens for Educational Freedom ("CEF") was launched at St. Matthew's Lutheran Church in Detroit.

59.     CEF advocated for parents' rights to elect to send their children to the schools of their choice.

60.     Michigan's CEF chapters were ecumenical including Catholic, Christian Reformed and Lutheran Church members.

61.     For instance, Grand Rapids' CEF Chapter included Dr. John Vandenburg, the President of Calvin College, which was a part of the Christian Reformed Church in North America.

62.     CEF's efforts played a role in the Michigan Constitutional Convention of 1961 to 1962. Attempts were made to alter Article II of the Michigan Constitution which prohibited money from being appropriated from the state treasury for "the benefit of any religious sect or society." Those attempts were unsuccessful.

63.     CEF's efforts then shifted to passage of a bus bill requiring all public school districts to extend bus service to nonpublic school pupils within the districts.

64.     Two groups in particular were bitterly opposed to the bus bill, namely the American Civil Liberties Union and the Protestants and Other Americans United for the Separation of Church and State.

65.     This time the anti-religious groups were unsuccessful, and in 1963, Governor George Romney signed the bus bill into law.

66.     Unsurprisingly, the Michigan ACLU brought a lawsuit challenging the constitutionality of the bus bill. That lawsuit wound its way through the Michigan courts for five years, at which point the Michigan Court of Appeals upheld the bus bill. *Alexander v. Bartlett*, 14 Mich. App. 177; 165 N.W.2d 445 (1968).

67.     In 1965, an Auxiliary Services Bill was introduced in the Michigan Legislature. This bill required local school boards to provide such things as crossing guards, speech services, and remedial reading services to religious and other nonpublic schools within each school district.

68.     Opposition to the bill was vehement and cast in religious terms.

69.    Midland's Public School Superintendent described it as "an example of the Toe in the Door approach to accomplish ends favoring minorities for self seeking reasons." He likened it to promotion of religious segregation.

70.    Another superintendent argued that the state "should avoid financial support for any instructional classes set up primarily on a segregated basis . . . by religion."

71.    Despite these anti-religious sentiments, the Auxiliary Services Bill also passed and was signed by Governor Romney in July 1965.

72.    Later that year, the Detroit News editorialized against the Auxiliary Services Bill acknowledging that "[n]on-public schools means, for all practical purposes, parochial schools." *Detroit News*, Oct 17, 1965.

73.    The CEF continued to lobby for further indirect aid to "church related schools."

74.    This lobbying led to the creation of an organization to oppose CEF's efforts, Michigan Citizens for the Advancement of Public Education or CAPE.

75.    CAPE's anti-religious aims were clear. One member lamented "three recent state laws" that had "diverted money to Church schools" and charged religious schools with "creating ghettos of the mind."

76.    In 1967, in the ferment created by the debate over auxiliary services, the Michigan Association of Non-Public Schools ("MANS") was formed. It was made up of members from the Lutheran, Reformed, Orthodox Jewish, and Catholic school systems.

77.     In 1968, the Michigan State Board of Education received a report on the state of Michigan's education system. The report included discussion of and support for government support of private schools.

78.     In early 1968, the Investment in the Education of Children Act was introduced in the Michigan Legislature. It would provide grants of up to $150 to parents of non-public students.

79.     The media labeled the act "Parochiaid" because the overwhelming majority of students in private schools were attending religious schools.

80.     The House and the Senate then authorized joint legislative hearings to examine the prudence, feasibility, and constitutionality of the Act.

81.     The joint report resulting from those hearings recommended the state appropriate $40 million to purchasing the teaching services of lay teachers of secular subjects in non-public schools.

82.     Eventually, the Legislature took up this recommendation and passed legislation, 1970 PA 100, which allowed the Department of Education to purchase educational services from nonpublic schools in secular subjects. The Michigan Supreme Court affirmed the appropriation's validity, concluding that the legislation neither advanced nor inhibited religion and did not violate the free exercise or establishment clauses of the U.S. or Michigan constitutions. *In re Advisory Opinion re Constitutionality of PA 1970, No. 100*, 384 Mich. 82; 180 N.W.2d 265 (1970).

83.     In 1970, the large majority of nonpublic school students were in religious schools.

84.    The Catholic schools accounted for nearly 218,000 of the 275,000 nonpublic school students in the state. *Detroit News*, 11/1/70.[1]

85.    The next largest system was the National Union of Christian Schools of the Christian Reformed Church, with 23,000 students. *Id.*

86.    As a result, "nonpublic schools" in Michigan circa 1970 *meant* "religious schools."

87.    Opponents of the 1970 funding measure turned public opinion against state funding by demonizing religious schools and the Catholic Church and the Catholic school system in particular.

**Michigan adopts a Blaine Amendment through Proposal C**

88.    The opponents to nonpublic school funding created a ballot committee, the "Council Against Parochiaid."

89.    "Parochiaid" is a religious slur meant to play on the word "parochial," which means "of or relating to a church parish and the area around it," see http://www.merriam-webster.com/dictionary/parochial, thus revealing that the initiative's motivation and purpose mirrored that of the various state Blaine Amendments of the 1800s.

90.    The Council Against Parochiaid introduced to the November 1970 ballot what was known as "Proposal C," which eventually became Article 8, § 2, ¶ 2 of the Michigan Constitution.

---

[1] At the time, there were 2.15 million students enrolled in Michigan public schools. National Center for Ed. Statistics, State Comparisons of Education Statistics: 1969-70 to 1996-97, p. 35 (Nov. 1998), https://nces.ed.gov/pubs98/98018.pdf.

91.     The proposal was seemingly neutral in its language, barring public funding not only for "denominational" schools but for all "nonpublic" schools. But the advocacy behind it was anything but. That advocacy made clear that Proposal C was an anti-religious measure aimed at harming religious groups.

92.     Consider just a portion of the public advocacy in support of Proposal C and against funding for religious schools:

- One of Proposal C's primary motivations was summed up in an address that Dr. Maurice Geary gave to the Citizens to Advance Public Education (CAPE), a prominent pro-Proposal C advocacy organization, at the May 21, 1969 CAPE Board of Directors meeting in Grand Rapids—animus against the Catholic Church. "The Catholic Church," he said, "is the biggest corporation in the United States. Real estate holdings are more than Standard Oil, A.T.&T. and U.S. Steel combined. . . . There is no more-closely guarded secret than the assets and income of the church." Dr. Geary opined that parochiaid is "anti-American" and inappropriate, particularly in a country where he "know[s] of no young person in college who is a devout follower of a church."

- The March and April 1970 issues of *The Vanguard*, the official publication of the Trade Union Leadership Council that was part of the pro-Proposal C coalition was filled from cover to cover with invectiveness including accusing Governor Milliken of vying for the Catholic vote and maligning State Representative Ryan for trying to get the public coffers opened to the church.

- On May 25, 1970, an article in the *Grand Rapids Press* presented poll numbers showing that Proposal C would be soundly defeated. But that was before the anti-religious propaganda began in earnest.

- A June 28, 1970 article in the *Flint Journal*, quoting a Michigan legislator, framed the forthcoming religious dispute this way: "Republicans who tend to have conservative images can be for abortion reform but against parochiaid—largely because of their Protestant background. Democrats, despite their liberal tags, can support parochiaid but oppose abortion reform—largely because of the Catholic influence."

- A pro-Proposal C ad published in the *Lansing State Journal* on October 29, 1970, and again on November 1, 1970, encouraged voters to "SUPPORT CHURCHES BY GIVING ON SUNDAY! (AND NOT WITH

OUR PUBLIC TAX MONEY).”  The ad urged a yes vote because “THE PUBLIC DID NOT ESTABLISH THE CHURCH SCHOOLS” and “THE PUBLIC DOES NOT HAVE A VOICE IN CHURCH SCHOOL AFFAIRS,” and religious schools promoted “SEGREGATION ON A RELIGIOUS BASIS!” The same ad appeared in the *Flint Journal* on November 1, 1970, the *Grand Rapids Press* on October 29, 1970, and the *Detroit Free Press* on October 3, 1970, and November 2, 1970.

- Another *Lansing State Journal* pro-Proposal C ad published on October 31, 1970 noted the current $22 million appropriation “for private and Parochial schools” and warned ominously that “When the Parochiaid people reach their goal of funding private and church schools on an equal basis with public schools, it will cost Michigan Taxpayers at least a QUARTER OF A BILLION DOLLARS!!”

- Yet another pro-Proposal C ad published in the *Lansing State Journal* on November 2, 1970, urged voters to say yes to Proposal C to “prevent the clergy of various sects from quarreling over how to divide the public’s money among them” and said a yes vote would “prevent government preference and favoritism toward one or a few churches”—presumably the Catholic and Christian Reformed churches that made up the overwhelming percentage of private religious schools.

- A pro-Proposal C op-ed published October 26, 1970, in the *Lansing State Journal* by the President of the Grand Rapids Chapter of Americans United for Separation of Church and State warned that “[a]s more tax funds are pumped into school systems not controlled by the public, enrollments are encouraged and other churches and private groups are encouraged to open similar schools in which to indoctrinate children in their religious or political beliefs.” *Voters should “reject all demands of politically-active clergy men* who are seeking tax funds for religious schools. It was their decision, not the public’s to open and to operate them. (Emphasis added.)

- A *Flint Journal* article on October 12, 1970, reported on a public speech by a prominent pro-Proposal C Methodist minister who “put it bluntly”: “the politicians want Catholic votes and the Catholic church wants money. It is that simple.” The speaker blamed the Catholic Schools’ need for public funding on the fact that “the schools are no longer popular.”

- Council Against Parochiaid campaign literature helped voters understand that Proposal C was *not* about private secular schools: “LET’S BE FAIR. . . . . . .More than 90% of all parochiaid funds go to schools owned by the clergy of one politically active church – a church which pays no taxes on

its $80 billion holding in real estate, stocks, bonds, and business investments, or on its $12 billion annual income in this country."

- A missive by Spend Taxes on Public Schools (STOP), a "committee of individuals and organizations formed to protect the public schools against such diversion of public tax funds," presented the City of Holland "as an example of the effect of spending public funds on private schools" based on Ottawa County's amendment to allow public support for private schools. As STOP explained, "Before that time, 80% of the children attended public schools; today only 20% do. There are strong Roman Catholic and Protestant schools, and the public schools are weak." "[P]arochial education's only purpose," STOP opined, "is complete indoctrination of the child in the religious beliefs of a single denomination or faith," including "teachers" "in the costume of a religious order."

- An October 14, 1970 *Saginaw News* article reported on a speech by the regional director for Americans United for Separation of Church and State who accused "religious leaders" "and "unprincipled politicians" of "join[ing] hands" "in open disrespect for law and truth" when it came to Proposal C. The director claimed that opposition to "parochiaid is not opposition to the Catholic religion." "But since the Catholic Church has entered the political arena, it must be confronted as a political entity."

- An October 25, 1970 *Detroit Free Press* editorial recognized the anti-religious fervor, even while supporting a yes vote on Proposal C: "When a state—especially a pluralist, diverse state—undertakes as a matter of public policy to support a church-related school system, it invites religious bitterness and stirs up religious discord."

- An October 31, 1970 *Detroit Free Press* editorial asked, "Who would have thought at this late date in our history that we could face a political battle with such overtones of religious bitterness? The basis for religious friction is not dead, not here nor in most other parts of the world. And when it is made a matter of public debate, religion is thrust into politics in a way that is risky to it and to the state." The editorial ultimately urged a yes vote on Proposal C, not because of any concerns over non-public-school funding generally but because "[t]he state simply has no business proving public funds for the support of *religious* institutions." [Emphasis added.]

- An October 10, 1970 *Detroit News* article reported on the leader of Michigan's (then) 370,000 United Methodists, who wrote in support of Proposal C in his denomination's publication, *Michigan Christian Advocate*, that the "phobia" motivating Proposal C supporters "is that the tax money is being used for *religious* education." [Emphasis added.]

21

- A *Grand Rapids Press* article on November 1, 1970, described the political debate over Proposal C in starkly religious terms, noting that "both supporters and opponents have been waging an intense campaign to sway voters in a state where Protestants outnumber Roman Catholics about two-to-one."

- A *Grand Rapids Press* op-ed published October 24, 1970, made similar points while discussing Proposal C's impact on the Michigan Governor's race, noting "[t]he complexity of the [Proposal C] issue, and the emotionalism and religiosity surrounding it." "Catholics . . . have been working hard against so-called Proposal C," it explains.

- The *Grand Rapids Press* published an article on October 22, 1970, summarizing the views of a member of the State Board of Education, explaining that "The ability of parochial schools to politick would be in serious question if Proposal C (the antiparochiaid constitutional amendment on the ballot) should pass."

- The Council Against Parochiaid in late October 1970 urged its county coordinators to organize letters to the editors—three to four each day—in the three weeks leading up to the election. *Proposal C Yes Bulletin* (Oct. 30, 1970). This resulted in a flood of anti-Catholic letters urging fellow citizens to vote yes on C, only a few of which are sampled here:

  o Some letters used religious schools to play the race card: "If public money pays for religious schools, there seems to be no reason why it would not also pay for racial school – all-black schools and all-white schools to teach hatred and intolerance." *Grand Rapids Press*, October 24, 1970.

  o Others warned about religious-school indoctrination of young minds: "The purpose of any religious school is to segregate children so as to indoctrinate them in a particular religion." *Grand Rapids Press*, October 19, 1970.

  o Still others urged a yes on Proposal C to "prevent the clergy of various sects from quarreling over how to divide the public's money among them." *Grand Rapids Press*, October 18, 1970.

  o A joint letter from the Michigan Education Association, American Civil Liberties Union, Committee Against Parochiaid, the League of Women Voters, the United Methodist Church, and Educators for Better Government—some of Proposal C's biggest supporters—played the discrimination card. A vote for Proposal C, they said "will preserve our public schools, which serve all children and hire teachers of all faiths without discrimination or bias. Private schools

discriminate in admission policies and in hiring policies." *Flint Journal*, October 31, 1970.

o  While others clearly understood that Proposal C was primarily a choice against or for religious schools, despite the Proposal's clearly neutral language: "The antiparochiaid forces argue, and I am inclined to agree, that they should not be forced to support schools that are grounded in religious faith." *Flint Journal*, October 19, 1970.

o  A letter supporting Proposal C argued that tolerance and a cohesive society are best achieved when students are not allowed to isolate themselves in religious schools. *Lansing State Journal*, October 30, 1970.

o  The Detroit Free Press noted that the debate regarding Proposal C was "a political battle with [ ] overtones of religious bitterness." *Detroit Free Press*, October 31, 1970.

93.  The religious invective proved successful. Voters approved Proposal C with 56% of the votes cast in November 1970. Brouillette, *School Choice in Michigan: A Primer for Freedom in Education* (Mackinac Center for Public Policy, 1999), pp 14–15.

94.  "I have never witnessed such anti-Catholic sentiment in my life," noted a state senator who himself opposed the aid package.

**The 1978 Voucher Initiative**

95.  In 1978, Michigan voters had a chance to repudiate their anti-religious vote in 1970. Instead, they doubled down on the anti-religious legacy.

96.  That year Proposal H was on the ballot. Proposal H would have barred the use of property taxes for school operating expenses and established a voucher program for financing Michigan school children's education at public and *nonpublic* schools.

23

97.     Americans United for the Separation of Church and State denigrated the petitioners as "parochiaiders" and that Proposal H was "radical blueprint for disaster promoted by sectarian special interests." Wake Up, Michigan! Americans United Pamphlet, 1978.

98.     CAP was not subtle regarding its anti-religious aims. One of its ads stated:

> HELP wanted: tough, pragmatic, no-nonsense business types with little or no understanding of poverty, kids with special needs, the elderly, municipal services or government in general. To administer drastic budget cuts in view of proposed amendments limiting the ability of democracies and representative governments to provide for the general good and welfare, and to subvert public funds for church schools. NINA (No one Intelligent Need Apply)." Council Against Parochiaid ad, *Detroit Free Press*, 8/4/78, campaigning against private-school voucher program.

99.     The Michigan Constitution retained its anti-religious animus.

**Michigan treats comparable secular activity more favorably than religious exercise**

100.    While prohibiting any public funding or tax deductions to benefit students attending religious schools, Michigan allows MESP tax-advantaged funds to be used to pay for public-school tuition.

101.    Under Michigan's Revised School Code, Act 451 of 1976, local school districts may decide to charge tuition to transfer into the district, provided they adhere to Michigan's cap on tuition fees. See Mich. Comp. Laws § 380.1401.

102.    Despite the cap, this tuition can be substantial. For the 2021–22 school year, the Bloomfield Hills public schools charge $12,000 per student. https://www.bloomfield.org/why-bloomfield/enrollment-options.

103.    "Other Michigan districts with tuition enrollment programs have [recently] attracted anywhere from a few dozen to more than 100 non-resident students whose families pay around $10,000 a year to attend, according to officials in those districts." Holly Fournier, *Grosse Pointe schools decide against tuition option*, The Detroit News (May 3, 2017), https://www.detroitnews.com/story/news/local/wayne-county/2017/05/03/gpps-tuition/101256656/; Monica Scott, *East Grand Rapids mailer on tuition-based IB program*, MLive (Apr. 3, 2019), https://www.mlive.com/news/grand-rapids/2015/05/grand_rapids_schools_touts_tui.html (noting $10,000 tuition cost minus a student's allocated per-pupil state funding amount).

104.    Because Michigan's Blaine Amendment does not prohibit State support or tax deductions for public schools, parents who choose to send their children out-of-district and pay tuition to do so may use their tax-advantaged MESP plan to pay that tuition without losing the Michigan tax deduction they received at the time they contributed to the MESP plan.

105.    Conversely, Michigan's Blaine Amendment will force a parent to refund the tax deduction they received if they use their MESP plan to pay tuition for a child they choose to send to a private, religious school.

## Count I
## Violation of the First Amendment to the U.S. Constitution
## Free Exercise Clause—Religious Animus.

106.    The preceding paragraphs are incorporated by reference.

107.    There exists an actual case and controversy between the parties in that they dispute the constitutionality of Article 8, § 2, ¶ 2 of the Michigan Constitution of 1963.

108.    Michigan's Blaine Amendment, Article 8, § 2, ¶ 2 of the Michigan Constitution, violates the Free Exercise Clause of the U.S. Constitution.

109.    The First Amendment to the U.S. Constitution states that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const., Am. I.

110.    The Free Exercise Clause "applies to the States by incorporation into the Fourteenth Amendment." *Employment Div. v. Smith*, 494 U.S. 872, 893 (1990).

111.    The "Free Exercise Clause 'protect[s] religious observers against unequal treatment,' and inequality results when a [decision-making body] decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542–43 (1993).

112.    "[T]he First Amendment forbids an official purpose to disapprove of *a particular religion* or of *religion in general*." *Lukumi*, 508 U.S. at 532 (emphasis added).

113.    At a bare "minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs." *Lukumi*, 508 U.S. at 532 (emphasis added).  "Facial neutrality is not determinative. . . . Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* at 534.

114.    Thus, a law's facial neutrality is insufficient to take it outside the scope of the Free Exercise Clause's strict scrutiny.

115.    As explained above, the Michigan historical record is replete with evidence that Michigan's 1970 Blaine Amendment was motivated by rampant anti-religious animus.

116.    At the time of the Amendment's passage, more than 90% of students attending nonpublic schools were at religious institutions.

117.    The ballot committee that placed Proposal C on the ballot used a religious slur for its name: the "Council Against Parochiaid."

118.    The relevant campaign literature, newspaper ads, and letters to the editor reveals attacks on religious persons, churches, and religious schools.

119.    In sum, the history and reality of the Michigan Blaine Amendment's passage demonstrate that it was enacted based on animus toward religious groups in general.

120.    The Catholic Church in particular was especially targeted for opprobrium.

121. The Amendment was specifically targeted to eliminate public funding for religious schools and to prevent religious families or school officials from effectively lobbying the Legislature for such funds again.

122. The "bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973).

123. Indeed, even a "slight suspicion that proposals for state intervention stem from animosity to religion or distrust of its practices" required invalidation of the government action. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1731 (2018).

124. There is at least a "slight suspicion" that Proposal C stemmed from animosity to religion or distrust of its practices.

125. Accordingly, Michigan's Blaine Amendment violates the Free Exercise Clause and 42 U.S.C. § 1983.

126. Absent injunctive and declaratory relief against Defendants, religious families who send their children to private, religious schools will continue to be harmed.

## Count II
## Violation of the First Amendment to the U.S. Constitution Free Exercise Clause—Differential Treatment.

127. The preceding paragraphs are incorporated by reference.

128.   The federal Constitution's Free Exercise Clause also prohibits unfavorable treatment of religion and religious exercise vis-à-vis comparable secular activity.

129.   Indeed, "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they threat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (per curiam), citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67–68 (2020) (per curiam).

130.   Michigan, acting through its Blaine Amendment, treats comparable secular activity more favorably than religious exercise. For example, parents may contribute to an MESP plan, receive a Michigan tax deduction, and use their MESP monies to pay for public-school tuition. But parents who use those same monies to pay for private, religious-school tuition will lose their tax deduction.

131.   The Michigan Blaine Amendment's differential treatment violates the Free Exercise Clause and 42 U.S.C. § 1983.

132.   Absent injunctive and declaratory relief against Defendants, religious families who send their children to private, religious schools will continue to be harmed.

## Count III
## Violation of the First Amendment to the U.S. Constitution
## Free Exercise Clause—Conditioning the Availability of Benefits
## on a Recipient's Willingness to Surrender its Religiously
## Impelled Status

133.    The preceding paragraphs are incorporated by reference.

134.    The Free Exercise Clause also prevents government from "'impos[ing] special disabilities on the basis of religious status' and condition[ing] the availability of benefits upon a recipient's willingness to surrender its religiously impelled status." *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246, 2256 (2020), quoting *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2202 (2017), among other cases.

135.    "To be eligible for government aid under the [Michigan] Constitution, a [religious] school [or family] must divorce itself from any religious control or affiliation. Placing such a condition on benefits or privileges 'inevitably deters or discourages the exercise of First Amendment Rights.'" *Id.*, quoting *Trinity Lutheran*, 137 S. Ct. at 2202, and *Sherbert v. Verner*, 374 U.S. 398, 405 (1963). Such coercion "punishes the free exercise of religion," and "is subject to 'the strictest scrutiny.'" *Id.*, quoting *Trinity Lutheran*, 137 S. Ct. at 2022.

136.    In Michigan, private, secular schools that desire public funding can seek charter-school status. See generally MCL 380.502 (regarding chartering of public-school academies).

137.    In fact, private secular schools have successfully made that transition and become charter schools.

138.   Private religious schools are denied that same choice.

139.   Such status-based discrimination—a direct effect of Michigan's Blaine Amendment—is always subject to the strictest scrutiny. Michigan's Blaine Amendment fails strict scrutiny.

140.   For a Michigan religious school, the reference to a "nonpublic" school in the Michigan Blaine Amendment does not eliminate the discriminatory result because a Michigan religious school can *only* be a "nonpublic" school.

141.   The fact that non-religious private schools are also excluded from a private benefit is completely irrelevant.

142.   What the Free Exercise Clause prevents is requiring the choice between remaining a religious school or become entitled to a public benefit.

143.   The Michigan Blaine Amendment's differential treatment violates the Free Exercise Clause and 42 U.S.C. § 1983.

144.   Absent injunctive and declaratory relief against Defendants, religious families who send their children to private, religious schools will continue to be harmed.

## Count IV
## Violation of the Fourteenth Amendment to the U.S. Constitution Equal Protection Clause—Creation of Political Structure that Discriminates Against Religion

145.   The preceding paragraphs are incorporated by reference.

146.   The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Am. XIV. This is "essentially a direction that all persons

similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

147.    The United States Supreme Court has "treated as presumptively invidious those classifications that disadvantage a 'suspect class,' or that impinge upon the exercise of a 'fundamental right.'" *Plyler v. Doe*, 457 U.S. 202, 216–217 (1982). When a state engages in such discrimination, it must "demonstrate that its classification has been precisely tailored to serve a compelling governmental interest." *Id.* at 217. Accordingly, laws that classify in this manner "are subjected to strict scrutiny." *City of Cleburne*, 473 U.S. at 440.

148.    It is undisputed that religion is both a suspect classification and a fundamental right. *United States v. Batchelder*, 442 U.S. 114, 125 n 9 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 214 (1972); *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943).

149.    Under the Equal Protection Clause, "the State may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Hunter v. Erickson*, 393 U.S. 385, 392 (1969). *See also Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457 (1982); *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).

150.    A "law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense," and leads to "the inevitable

inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Romer v. Evans*, 517 U.S. 620, 633, 634 (1996).

151.   Michigan's Blaine Amendment establishes classifications in the structure of government based on religion in violation of the Equal Protection Clause of the Fourteenth Amendment.

152.   Under Michigan's Blaine Amendment, for religious parents and religious schools to secure lawful aid to help them educate their children or to help them aid their schools, they must mount a statewide campaign to amend the Constitution of the State of Michigan.

153.   Unlike members of other suspect classes, religious persons and schools cannot lobby their state representative or state senator for governmental aid or tuition help. Rather, they must undertake the onerous process of securing signatures and passing a state constitutional amendment.

154.   By eliminating the right of religious persons and institutions to petition for legislative help on the same terms as members of other suspect classes, the Michigan Blaine Amendment structurally denies religious persons and institutions the "rights, privileges and immunities" secured by the Equal Protection Clause and by the Constitution and laws of the United States.

155.   Consequently, Michigan's Blaine Amendment violates 42 U.S.C. § 1983.

156.   Absent injunctive and declaratory relief against Defendants, religious schools and parents will continue to be harmed.

## Prayer for Relief

### Wherefore, Plaintiffs request that this Court:

a.   Enter a declaratory judgment that the Michigan Blaine Amendment is unconstitutional on its face and as-applied.

b.  Issue an Order permanently enjoining Defendants from demanding from Plaintiffs or any PACE Foundation members a refund for MESP tax deductions based on the use of MESP monies to pay private-school K-12 tuition.

c.  Issue an Order permanently enjoining Defendants from enforcement of the Michigan Blaine Amendment.

d.  Award Plaintiffs' Costs and Expenses, including its attorneys' fees, pursuant to 42 U.S.C. § 1988; and

e.  Award such other relief as it deems equitable and just.

Dated: September 23, 2021          /s/ John J. Bursch
                                   John J. Bursch
                                   BURSCH LAW PLLC
                                   9339 Cherry Valley Ave SE, #78
                                   Caledonia, Michigan 49316
                                   (616) 450-4235
                                   jbursch@burschlaw.com

                                   Patrick Wright
                                   MACKINAC CENTER LEGAL
                                   FOUNDATION
                                   140 W. Main Street
                                   Midland, MI 48640
                                   (989) 631-0900
                                   Wright@mackinac.org

                                   Attorneys for Plaintiffs