## UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Kelly L. Stephens
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  November 06, 2023

Mr. Christopher Mark Allen
Mr. Linus Richard Banghart-Linn
Office of the Attorney General of Michigan
P.O. Box 30212
Lansing, MI 48909

Mr. John J. Bursch
Bursch Law
9339 Cherry Valley, S.E., Suite 78
Caledonia, MI 49316

Mr. Jeffrey Scott Donahue
White Schneider
2300 Jolly Oak Road
Okemos, MI 48864

Mr. Daniel S. Korobkin
ACLU Fund of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Re:  Case No. 22-1986, *Jill Hile, et al v. Michigan, et al*
Originating Case No. : 1:21-cv-00829

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Ann E. Filkins

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0243p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

———————————

JILL HILE; SAMANTHA JACOKES; PHILLIP JACOKES;
NICOLE LEITCH; MICHELLE LUPANOFF; GEORGE
LUPANOFF; PARENT ADVOCATES FOR CHOICE IN
EDUCATION FOUNDATION; JOSEPH HILE; JESSIE BAGOS;
RYAN BAGOS; JASON LEITCH,

      *Plaintiffs-Appellants,*

     *v.*

STATE OF MICHIGAN; GRETCHEN WHITMER, Governor,
in her official capacity; RACHAEL EUBANKS, Michigan
Treasurer, in her official capacity,

      *Defendants-Appellees.*

No. 22-1986

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:21-cv-00829—Robert J. Jonker, District Judge.

Argued: August 2, 2023

Decided and Filed: November 6, 2023

Before: STRANCH, BUSH, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** John J. Bursch, BURSCH LAW, PLLC, Caledonia, Michigan, for Appellants. Linus Banghart-Linn, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan. **ON BRIEF:** John J. Bursch, BURSCH LAW, PLLC, Caledonia, Michigan, for Appellants. Linus Banghart-Linn, Christopher Allen, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan. Jeffrey S. Donahue, WHITE SCHNEIDER PC, Lansing, Michigan, Daniel S. Korobkin, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for Amici Curiae.

STRANCH, J., delivered the opinion of the court in which BUSH, J., joined.  MURPHY, J. (pp. 17–28), delivered a separate dissenting opinion.

———————————

## OPINION

———————————

JANE B. STRANCH, Circuit Judge.  Plaintiffs-Appellants are individuals, including Jill and Joseph Hile, and the organization Parent Advocates for Choice in Education (PACE) Foundation (collectively Plaintiffs).  They have sued the State of Michigan and its Governor and Treasurer (collectively the State), raising free exercise and equal protection claims to challenge a 1970 state constitutional amendment that they claim had anti-religious origins.  The amendment prohibits payment of "public monies" to "any private, denominational or other nonpublic" school.  *See* Mich. Const. art. VIII, § 2.  The State successfully moved to dismiss all claims in the complaint, and Plaintiffs appeal only the dismissal of their equal protection claim, which is based on a political process theory.  They claim that because of the amendment, religious persons and schools cannot lobby their state representatives for governmental aid or tuition help without first amending the state constitution, which they argue disadvantages them in the political process.  For the following reasons, we **AFFIRM** the district court's dismissal of this claim.

## I.  BACKGROUND

### A.  The 1970 Enactment of Article VIII, § 2

In 1970, a 57% majority of Michigan voters approved a ballot initiative known as Proposal C, amending Article VIII, § 2 of Michigan's constitution, and adding the following: "No public monies or property shall be appropriated or paid or any public credit utilized, by the legislature or any other political subdivision or agency of the state directly or indirectly to aid or maintain any private, denominational or other nonpublic, pre-elementary, elementary, or secondary school."  Mich. Const. Art. VIII, § 2; State of Michigan Bureau of Elections, *Initiatives and Referendums Under the Constitution of the State of Michigan of 1963*, at 2 (2019).

The Hile complaint alleges that this ballot initiative was spurred by the legislature's passage of a law, 1970 PA 100, which "allowed the Department of Education to purchase educational services from nonpublic schools in secular subjects," (R. 1, ¶ 82, PageID 17), and authorized $22 million in spending during the 1970-71 school year, *see* 1970 PA 100, Ch. 2 § 58. In 1970, most nonpublic schools in Michigan were religious schools, and Catholic schools accounted for the majority of nonpublic school students in the state. Plaintiffs allege that "nonpublic schools" meant "religious schools" when 1970 PA 100 was passed. Opponents of the law formed a ballot committee, the Council Against Parochiaid, and introduced Proposal C. Plaintiffs acknowledge that the language of Article VIII, § 2 is facially neutral as to religion, but contend that the advocacy behind it was not, citing a variety of speeches, trade publications, op-eds, and pro-Proposal C ads that they characterize as evidencing anti-Catholic animus.

Indeed, Plaintiffs allege that Article VIII, § 2 is a "Blaine Amendment." That name comes from an amendment to the United States Constitution that was proposed in 1875 by House Speaker James G. Blaine of Maine, which would have explicitly barred government aid to religious schools and institutions. The full text of the proposed Blaine Amendment, which failed to pass in the Senate, is as follows:

> No State shall make any law respecting an establishment of religion or prohibiting the free exercise thereof; and no money raised by taxation in any State for the support of public schools, or derived from any public fund therefore, nor any public lands devoted thereto, shall ever be under the control of any religious sect, nor shall any money so raised or lands so devoted be divided between religious sects or denominations.

H.R.J. Res. 1, 44th Cong., 4 Cong. Rec. 205 (1875). Plaintiffs contend that the 1875 proposal bears on the constitutionality of Article VIII, § 2, even though Michigan's amendment was enacted ninety-five years later and does not contain language specifically disfavoring funding for religious use.

### B.  The 2000 Election Pertaining to Article VIII, § 2

In 2000, a 69% majority of Michigan voters rejected a ballot initiative that would have amended Article VIII, § 2. *See* State of Michigan Bureau of Elections, *Initiatives and Referendums Under the Constitution of the State of Michigan of 1963*, at 5 (2019). The initiative

would have authorized "indirect" support of non-public school students and created a voucher program permitting "any pupil resident [in certain unperforming public school districts] to receive a voucher for actual elementary and secondary school tuition to attend a nonpublic elementary or secondary school."  Initiative Petitions—Proposed Amendments to the Michigan Constitution, Proposal 00-1, https://www.legislature.mi.gov/(S(ty1fmdpfvr2nzi1xxsyh0 r00))/documents/publications/Mpla/2000/2000-mpla-initiative.pdf.  The initiative would have eliminated Article VIII, § 2's bar on indirect funding of private education by authorizing a state school voucher system.  Voters chose to maintain Article VIII, § 2, which prohibits payment of public money to "any private, denominational or other nonpublic" school.  There is no allegation in the complaint of any anti-religious or anti-Catholic animus associated with the 2000 election.

### C.  Procedural History

More than fifty years after the enactment of Article VIII, § 2, Plaintiffs brought this suit, alleging three free exercise claims and one equal protection claim.  They appealed only the equal protection claim, but we briefly note the others for context.

For the free exercise claims, the individual Plaintiffs alleged that as parents of school-age children, they have funded Michigan Education Savings Program (MESP) plans and wish to use those plans "to pay for their children's private, religious-school tuition in Michigan," but "if they do so, the State of Michigan will use [Art. VIII, § 2] to force them to reverse the Michigan tax deduction they received at the time that they made the MESP contributions."  R. 1, PageID 6-7.  The district court dismissed the free exercise claims on comity grounds, holding that consideration on the merits "would require this court to disregard the State's own interpretation and consistent application of its own tax law."  R. 39, Op. & Order, PageID 281.  This holding is not challenged on appeal.

For the equal protection claim, Plaintiffs advance a political process theory of liability—recognized by the Supreme Court in *Hunter v. Erickson*, 393 U.S. 385 (1969), and *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982)—to argue that, while Article VIII, § 2 is facially neutral, it nevertheless creates a political structure that unconstitutionally discriminates against religion.  The Hile complaint alleges a general injury to "religious parents and religious

schools," claiming that "to secure lawful aid to help them educate their children or to help them aid their schools, they must mount a statewide campaign to amend the Constitution of the State of Michigan" and cannot simply lobby their state representative or state senator for governmental aid or tuition help.  R. 1, PageID 33.  The complaint does not, however, allege that the individual Plaintiffs are religious (or that they are members of any particular religious sect).  And the PACE Foundation is not alleged to be a lobbying group; it is described as "coalition of parent advocates who can learn about the need to protect and advance their rights" and the "potential impact of legislation."  *Id.*, PageID 7.  Plaintiffs seek a declaratory judgment that Article VIII, § 2 is unconstitutional and an order permanently enjoining its enforcement.

The district court dismissed this claim, explaining that the political process doctrine "has never been applied outside the arena of racial discrimination," and may no longer be viable after the Supreme Court plurality's decision in *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291, 307 (2014).  R. 39, PageID 283.  The district court stated that Article VIII, § 2 is facially neutral:

> It does not by its terms single out any religious minority for unequal treatment; rather, it draws the line between public education, on the one hand, and all forms of private education on the other hand.  That means the parents of children at non-sectarian private schools like Cranbook or Country Day are on exactly the same footing as the parents of children at Catholic Central or Grand Rapids Christian when it comes to use of public funds.

*Id.*  The district court was "unwilling to expand an already tenuous political process doctrine into these new arenas," and granted the State's motion to dismiss.  *Id.*, PageID 284.  Plaintiffs timely appealed.

## II.  ANALYSIS

The two main issues presented in this appeal are (1) whether Plaintiffs have standing, and (2) whether the district court properly dismissed their political process claim on the merits.

### A.  Standard of Review

We review de novo a district court's grant of a motion to dismiss.  *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017).  In reviewing a facial attack to a complaint under Rule

12(b)(1) for lack of standing, "we must accept the allegations set forth in the complaint as true" while "drawing all inferences in favor of the plaintiff," just as we do in reviewing a 12(b)(6) motion to dismiss for failure to state a claim. *Mosley v. Kohl's Dep't Stores, Inc.*, 942 F.3d 752, 756 (6th Cir. 2019) (quoting *Gaylor v. Hamilton Crossing CMBS*, 582 F. App'x 576, 579 (6th Cir. 2014)). We then "examine whether the complaint contains 'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Hill*, 878 F.3d at 203 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But "a legal conclusion couched as a factual allegation" need not be accepted as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

## B. Standing

The State asserts that Plaintiffs lack standing. By dropping their claims relating to the denial of tax benefits, the State argues that Plaintiffs fail to assert an injury under *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The State contends that the Hile complaint failed to adequately allege that Plaintiffs are religious, so their claim that religious persons are disadvantaged in the political process by Article VIII, § 2 is not a concrete injury for standing purposes.

While the complaint alleges that the individual Plaintiffs are "parents of school-age children" who would like to use MESP funds to pay for private religious school tuition, it does not expressly allege that Plaintiffs themselves are religious or part of a particular religious minority. R. 1, PageID 6-7. And despite containing allegations that Article VIII, § 2 was enacted with anti-Catholic animus, Plaintiffs do not specify that they are Catholic or seek to send their children to private Catholic schools. But in "[r]eviewing the district court's decision on a motion to dismiss, we construe the plaintiff's complaint liberally," and draw "all reasonable inferences in favor of the plaintiff." *Logsdon v. Hains*, 492 F.3d 334, 340 (6th Cir. 2007). That the individual Plaintiffs are religious is a reasonable inference to draw from this complaint because they allege that they wish to send their children to religious schools, and because they assert free exercise and religious-based equal protection claims in the complaint.

That does not, however, end our standing inquiry, as injury-in-fact is required.  There remains a question as to whether the Hile complaint has plausibly alleged that Plaintiffs are able and ready to participate in lobbying activities relating to public funding for private religious schools, such that they have suffered a concrete injury-in-fact.  *See Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993); *Gratz v. Bollinger*, 539 U.S. 244 (2003).  This is a close call because Plaintiffs abandoned on appeal their claims relating to Article VIII, § 2's effect on their ability to use tax-advantaged MESP funds for their children's private, religious education.  That leaves Plaintiffs' political process claim untethered from a specific legislative policy change they may seek to advance and renders their injury somewhat conjectural.  In other words, Plaintiffs seek to lobby generally, without a particular legislative policy in mind.

But at the pleading stage, a plaintiff need only demonstrate a plausible entitlement to standing.  *Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 543-44 (6th Cir. 2021).  For an equal protection claim, a party "need only demonstrate that it is able and ready" to engage in activity "and that a discriminatory policy prevents it from doing so on an equal basis." *Jacksonville*, 508 U.S. at 666.  The Supreme Court has held that:

> When the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing.  The "injury in fact" in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit.

*Id.*

Judge Murphy's comprehensive dissent takes issue with Plaintiffs' ability to show injury-in-fact.  Like Judge Murphy, we are happy to leave several of the thoughtful questions posed by his dissent for another day, and focus here on the narrow issue representing its core:  Whether Plaintiffs have plausibly alleged that, absent Article VIII, § 2's bar on funding for private education, they stand able and ready to lobby the Michigan legislature to allow them to use their 529 plans for religious-school tuition.  Plaintiffs' allegations include that (1) they wish to use their 529 plans to pay for their children's religious-school tuition, Compl. ¶¶ 17-21, PageID 6-7;

No. 22-1986                      *Hile, et al. v. Michigan, et al.*                      Page 8

(2) Article VIII, § 2 means that parents who wish to send their children to religious schools, like Plaintiffs, "cannot lobby their state representative or state senator for governmental aid or tuition help," Compl. ¶ 153, PageID 33; and (3) each individual parent is a member of PACE, an organization dedicated to advancing parents' rights and evaluating legislation concerning education policy.   Compl. ¶¶ 17-22, PageID 6-7.   Though the question is close, making reasonable inferences in Plaintiffs' favor and drawing on "experience and common sense," these allegations render it at least plausible that if Article VIII, § 2 is declared unconstitutional, Plaintiffs would lobby their representatives to change Michigan's law concerning 529 plans.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

Plaintiffs have also satisfied the final two elements of standing—causation and redressability.  *See Lujan*, 504 U.S. at 560-61.  Their injury is caused by Article VIII, § 2 because if there were not a constitutional prohibition on public funding for private schools, Plaintiffs could lobby their representatives for aid "with efficacy."  If Plaintiffs obtain declaratory and injunctive relief, moreover, their injury will be redressed because they will be able to lobby on equal footing with those seeking aid for public schools.  And if the individual Plaintiffs have standing, the PACE Foundation consequently has organizational standing. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  As a result, Plaintiffs' claims are constitutionally adequate.

### C.  The Merits

Turning to the merits, the parties dispute whether the political process doctrine remains viable after the Supreme Court's decision in *Schuette*, and whether this theory of liability can apply to claims of religious discrimination.  While the parties agree that Article VIII, § 2 is facially neutral, Plaintiffs argue that it was enacted for anti-religious reasons, and that it has a discriminatory impact on religious people and schools.  The State disputes this characterization of the amendment and further argues that the 2000 election purged any possible taint of animus. We address these arguments below.

No. 22-1986                     *Hile, et al. v. Michigan, et al.*                     Page 9

### 1.  The Political Process Doctrine

The political process theory of liability was recognized by the Supreme Court in *Hunter v. Erickson* and *Washington v. Seattle School District No. 1*.  In each case, local government bodies passed antidiscrimination measures (related to fair housing and school desegregation, respectively), and the wider electorate responded with ballot initiatives requiring such antidiscrimination measures to be approved by a majority of voters.  Although the ballot initiatives were facially neutral, the Supreme Court recognized that they violated equal protection principles by subjecting legislation benefiting racial minorities to a more burdensome political process than that imposed on other legislation.

In *Hunter*, the city council of Akron, Ohio enacted a fair housing ordinance that prohibited discrimination on the basis of race, color, religion, or national origin.  393 U.S. at 386.  Voters responded with a ballot initiative amending Akron's City Charter to prevent the city council from implementing any ordinance dealing with discrimination in housing on those bases without the approval of a majority of voters.  *Id.* at 387.  The new law "thus drew a distinction between those groups who sought the law's protection against racial, religious, or ancestral discriminations in the sale and rental of real estate and those who sought to regulate real property transactions in pursuit of other ends."  *Id.* at 390.  On its face, the law treated Black and white, "Jew and gentile in an identical manner," but the Supreme Court reasoned that "the reality is that the law's impact falls on the minority."  *Id.* at 391.  The Court held that the ballot measure "places [a] special burden on racial minorities within the governmental process.  This is no more permissible than denying them the vote, on an equal basis with others."  *Id.*  In other words, the ballot initiative discriminated against minorities and violated the Equal Protection Clause "by making it more difficult to enact legislation [on their] behalf."  *Id.* at 393.

This political process theory was reaffirmed in *Seattle*, which concerned a school district's busing plan to desegregate its schools.  458 U.S. at 461.  Voters responded by passing a statewide ballot initiative that prohibited school boards from requiring students to attend a school other than the one geographically nearest to their homes.  *Id.* at 462.  The statewide initiative was held to violate the Equal Protection Clause because "it uses the racial nature of an issue to define the governmental decisionmaking structure, and thus imposes substantial and unique burdens on

racial minorities." *Id.* at 470.  Even though the initiative did not expressly mention race and was facially neutral, the Supreme Court concluded that "there is little doubt that the initiative was effectively drawn for racial purposes." *Id.* at 471.  As the Court explained:

> The initiative removes the authority to address a racial problem—and only a racial problem—from the existing decisionmaking body, in such a way as to burden minority interests.  Those favoring the elimination of *de facto* school segregation now must seek relief from the state legislature, or from the statewide electorate. Yet authority over all other student assignment decisions, as well as over most other areas of educational policy, remains vested in the local school board.

*Id.* at 474.

*Schuette*, however, casts doubt on the continued viability of political process claims.  It involved a challenge to Article I, § 26 of the Michigan Constitution that was enacted by ballot initiative in 2006 and prohibited public universities from considering race in their admissions processes.  572 U.S. at 298-99.  In articulating the Supreme Court's prior political process jurisprudence, a three-Justice plurality took a narrow view, explaining that "*Hunter* rests on the unremarkable principle that the State may not alter the procedures of government to target racial minorities." *Id.* at 304.  And "*Seattle* is best understood as a case in which the state action in question . . . had the serious risk, if not purpose, of causing specific injuries on account of race." *Id.* at 305.  The *Schuette* plurality held that the political process doctrine applies only in cases where "the political restriction in question was designed to be used, or was likely to be used, to encourage infliction of injury by reason of race." *Id.* at 314.

The plurality specifically rejected a "broad reading" of *Hunter* and *Seattle*. *Id.* at 307.  It expressed a concern that determining whether legislation benefits a particular racial group requires courts to "define individuals according to race" and results in inquiries and categories that depend on "demeaning stereotypes" such as the notion that members of the same racial group share the same political interests. *Id.* at 308.  In upholding the constitutionality of Article I, § 26, the plurality refused to disempower Michigan voters from "choosing which path to follow," reasoning that:

> Were the Court to rule that the question addressed by Michigan voters is too sensitive or complex to be within the grasp of the electorate; . . . or that these matters are so arcane that the electorate's power must be limited because the

people cannot prudently exercise that power even after a full debate, that holding would be an unprecedented restriction on the exercise of a fundamental right held not just by one person but by all in common.  It is the right to speak and debate and learn and then, as a matter of political will, to act through a lawful electoral process.

*Id.* at 312.

### 2.  Plaintiffs' Political Process Claim

As a preliminary matter, it is far from settled that a political process claim may be based on religious discrimination.  The ballot initiative at issue in *Hunter* removed local authority to regulate discrimination based on race, religion, and ancestry, but that challenge was brought by a Black plaintiff alleging racial discrimination.  Much of the language in *Hunter* focused on the initiative's impact on racial minorities, as did the Supreme Court's later decisions in *Seattle* and *Schuette*.  Still, the Supreme Court implied in *Hunter* that the ballot initiative violated the Equal Protection Clause as to all referenced classifications.  393 U.S. at 390-91 ("[A]lthough the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority.").  And it is undisputed here that religion, like race, is a suspect classification subject to heightened scrutiny for equal protection purposes.  That said, Plaintiffs cite no precedent in which a court has recognized a political process claim based on religious discrimination.  We need not resolve this issue, however, because Plaintiffs' political process claim fails for other reasons.

To start, Plaintiffs offer no principled basis for distinguishing Article VIII, § 2 from the Michigan constitutional amendment prohibiting affirmative action that was upheld in *Schuette*.  Plaintiffs argue that *Schuette* allowed the challenged amendment to stand because it "required equal treatment" and did not involve the sort of harm or animus present in the earlier political process cases.  This is a distinction without a difference.  It is undisputed that Article VIII, § 2 is facially neutral: it prohibits the payment of public funds to "private, denominational or other nonpublic" schools.  It prohibits public funding of all private schools, whether religious or secular.  Plaintiffs—parents who wish to send their children to religious schools—are treated the same as parents who wish to send their children to private, non-religious schools.  All individuals

wishing to change the funding scheme embodied in Article VIII, § 2 must follow the same process of amending Michigan's constitution.

Adding Article VIII, § 2 to Michigan's constitution through Proposal C, moreover, embodied a legitimate policy choice that public funds be spent on public schools.  The Supreme Court has long held that there is no "right of private or parochial schools to share with public schools in state largesse." *Maher v. Roe*, 432 U.S. 464, 477 (1977) (quoting *Norwood v. Harrison*, 413 U.S. 455, 462 (1973)).  And just last year, it reiterated that "[a] State need not subsidize private education." *Carson ex rel. O.C. v. Makin*, 142 S. Ct. 1987, 1997 (2022) (quoting *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020)).  Of course, under the Free Exercise Clause, "once a State decides to do so, it cannot disqualify some private schools solely because they are religious." *Espinoza*, 140 S. Ct. at 2261.  But Article VIII, § 2 does not—it draws a distinction only between public and private schools, not between secular and religious schools.  While parents have a fundamental right to control the education of their children, "a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan v. Tax'n With Representation of Wash.*, 461 U.S. 540, 549 (1983).  In other words, Proposal C evidences the legitimate choice of Michigan's electorate to dedicate public funds to public schools.  *Schuette*, moreover, cautioned that courts should not remove "a difficult question of public policy" from "the realm of public discussion, dialogue, and debate in an election campaign."  572 U.S. at 312.  Such a withdrawal would have "serious First Amendment implications" and would be "inconsistent with the underlying premises of a responsible, functioning democracy." *Id.*

Plaintiffs contend that the facial neutrality of Article VIII, § 2 is of no moment because the Michigan Supreme Court has determined that the amendment was motivated by anti-religious bias.  This argument relies on Plaintiffs' reading of a footnote in an advisory opinion of the Michigan Supreme Court that upheld the constitutionality of Article VIII, § 2 (except insofar as the provision prohibited shared-time instruction and auxiliary services). *In re Proposal C.*, 185 N.W.2d 9, 29-30 (Mich. 1971).  The footnote explained that "[a]s far as the voter was concerned, the result of all the pre-election talk and action concerning Proposal C was simply this—Proposal C was an anti-parochiaid amendment—no public monies to run parochial schools—and beyond

No. 22-1986                    *Hile, et al. v. Michigan, et al.*                    Page 13

that all else was utter and complete confusion." *Id.* at 15 n.2.   The Court's footnoted characterization of Proposal C as an "anti-parochiaid amendment" is a far cry from a determination or holding that it was enacted with anti-religious animus.   In the body of its ruling, the Court concluded that the purpose of Proposal C "above all else" was to prohibit "state funding of purchased educational services in *the nonpublic school* where the hiring and control is in the hands of the *nonpublic school*, otherwise known as 'parochiaid.'" *Id.* at 29-30 (emphases added).   This advisory opinion footnote does not constitute a holding that Proposal C was motivated by anti-religious or anti-Catholic animus.

In a more recent case, the Michigan Supreme Court made clear that whether Proposal C has an adverse impact on religion remains an open question.   *See Council of Orgs. & Others for Educ. About Parochiaid v. State*, 958 N.W.2d 68, 80 n.13 (Mich. 2020).   There, the Court noted that "Proposal C was drafted by an entity named 'Council Against Parochiaid,'" a term that "undoubtedly referred to public funding for religious schools," which "might suggest that Proposal C was intended to target religious schools." *Id.*   But the Court expressly declined to determine whether "these considerations regarding antireligious sentiments render Proposal C indistinguishable from the state constitutional provision at issue in . . . *Espinoza*," both because the parties failed to raise First Amendment arguments and in light of *In re Proposal C*'s "saving interpretation" of the amendment.   *Id.*   In sum, the Michigan Supreme Court has never held that Proposal C was motivated by anti-religious animus.

Plaintiffs' repeated claim that Proposal C constitutes a "Blaine Amendment" is similarly unsupported by the historical record.   Speaker Blaine's proposed amendment specifically precluded the use of public funds or lands by "any religious sect." H.R.J. Res. 1, 44th Cong., 4 Cong. Rec. 205 (1875).   After Blaine's constitutional amendment failed in Congress, many states chose to incorporate amendments with similar wording into their state constitutions and charters in the late 1800s.   *See* Mark Edward DeForrest, *An Overview and Evaluation of State Blaine Amendments: Origins, Scope, and First Amendment Concerns*, 26 Harv. J.L. & Pub. Pol'y 551, 573 (2003).   But Michigan voters originally adopted Article VIII, § 2 nearly a century after Blaine's 1875 proposal, a time gap that severs any reasonable link between Michigan's amendment and Reconstruction-era anti-Catholic bigotry.   And even more tellingly, Michigan's

amendment—unlike actual state-level Blaine Amendments—draws a line between public and private funding rather than between religious and nonreligious aid. Because Michigan's bar on public funding for private schools lacks either temporal or textual connection to Speaker Blaine's proposal, it cannot be accurately described as a Blaine Amendment.

Plaintiffs also attempt to minimize the import of Article VIII, § 2's religious neutrality by contending that at the time Proposal C was enacted in 1970, the vast majority of nonpublic school students were enrolled in Catholic schools, and that "nonpublic" was effectively synonymous with "religious" when it came to schools. But this does not necessarily support Plaintiffs' broader claim that Proposal C was based on anti-Catholic animus. The Supreme Court has rejected similar arguments in Establishment Clause challenges to the public funding of private schools: "The constitutionality of a neutral educational aid program simply does not turn on whether and why, in a particular area, at a particular time, most private schools are run by religious organizations, or most recipients choose to use the aid at a religious school." *Zelman v. Simmons-Harris*, 536 U.S. 639, 658 (2002); *see also Mueller v. Allen*, 463 U.S. 388, 401 (1983) ("We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on . . . the extent to which various classes of private citizens claimed benefits under the law.").

The State also explains that even if we assume Proposal C was enacted in 1970 based on anti-religious reasons, the 2000 election reauthorizing the amendment purged any taint of animus. Plaintiffs insist that the 2000 election has no bearing on their suit. Indeed, they claim that it is improper for this court to consider the 2000 ballot proposal given the procedural posture of the case (on appeal from a motion to dismiss) and because they chose not to reference the 2000 election in the complaint. But we may "take judicial notice of the legislative and constitutional history" of the amendment, "especially where such materials [do] not speak to any disputed fact." *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010). Plaintiffs do not dispute that in the 2000 election, Michigan voters were asked to consider a school voucher proposal that would have repealed Article VIII, § 2. Instead, they posit that "a vote against repeal is not the same as a vote to readopt." This is mere semantics. In the 2000 election, voters were asked whether they wanted to "[e]liminate [the] ban on indirect support of students attending nonpublic schools through tuition vouchers, credits, tax benefits, exemptions or

No. 22-1986                    *Hile, et al. v. Michigan, et al.*                    Page 15

deductions, subsidies, grants or loans of public monies or property" embodied in Article VIII, § 2, and allow students to use tuition vouchers to attend nonpublic schools instead.  *See* Initiative Petitions—Proposed     Amendments     to     the     Michigan     Constitution,     Proposal 00-1, https://www.legislature.mi.gov/(S(ty1fmdpfvr2nzi1xxsyh0r00))/documents/ publications/Mpla/2000/2000-mpla-initiative.pdf.  In choosing not to do so, Michigan voters necessarily chose to stand by Article VIII, § 2 as adopted in 1970.

        Supreme Court precedent establishes that a later reauthorization of a law can purge the taint of a discriminatory purpose.  In *Rostker v. Goldberg*, for example, the Court held that where Congress "thoroughly reconsider[ed]" an earlier law, even without formally reauthorizing it, that later legislative history was "highly relevant in assessing [its] constitutional validity."  453 U.S. 57, 75 (1981).  *Rostker* upheld the Military Selective Service Act, which required men, but not women, to register for the military, explaining that Congress's recent reconsideration of the policy was relevant to determine whether the decision to exempt women from registration was discriminatory.  *Id.* at 74-75.  In doing so, the Court rejected the argument "that we must consider the constitutionality of the [law] solely on the basis of the views expressed by Congress in 1948, when the [law] was first enacted[.]"  *Id.* at 74.  One of the sources Plaintiffs rely upon confirms this principle.  *See* Toby J. Heytens, Note, *School Choice and State Constitutions*, 86 Va. L. Rev. 117, 147-48 (2000) ("Explicit legislative reauthorization purges the taint of prior discriminatory purpose; the newly authorized, facially neutral provision is therefore constitutional unless a fresh showing of discriminatory purpose is made.").  Michigan voters' reconsideration of the constitutional prohibition on public funding for nonpublic schools and their rejection of the 2000 ballot proposal eradicated any possible concerns of anti-religious animus stemming from the 1970 campaign surrounding Proposal C.

### III.  CONCLUSION

        For these reasons, we find that Plaintiffs have standing to bring their political process claim but hold that Article VIII, § 2 does not violate Plaintiffs' equal protection rights.  As noted by the district court, to hold otherwise would require striking down a facially neutral law that does not single out religious people for disfavored treatment and would effectively contradict the Supreme Court's directive that a State need not subsidize private education.   Such a

No. 22-1986           *Hile, et al. v. Michigan, et al.*           Page 16

determination, moreover, would implicitly assume that the people of Michigan cannot "prudently exercise" their electoral power even following a full debate—"an unprecedented restriction on the exercise of a fundamental right held not just by one person but by all in common." *Schuette*, 572 U.S. at 312.  We **AFFIRM** the district court's judgment.

---------------------

## DISSENT

---------------------

MURPHY, Circuit Judge, dissenting.   The plaintiffs raise weighty challenges to a Michigan constitutional provision that bars its legislature from spending public funds on private schools.   But no matter how important the merits are, federal courts have no business resolving them unless they arise in a "Case" or "Controversy" within the meaning of Article III of the Constitution.   This text requires plaintiffs to plead their standing by alleging that they have suffered (or will suffer) an injury traceable to a defendant's conduct and likely to be redressed by the requested relief.

The plaintiffs' complaint here asserted that the challenged constitutional provision caused one injury, and their appellate brief highlighted another one.   But they have not plausibly pleaded standing for either injury.   Their complaint alleged that the constitutional provision required them to incur a tax penalty if they used their education-savings accounts to pay for their children's religious schools.   This monetary harm certainly qualifies as an Article III injury.   But the plaintiffs concede on appeal that Michigan *statutory* law independently triggers the tax penalty, so an injunction against the *constitutional* provision would not redress that harm.   On appeal, then, the plaintiffs shifted to an unequal-treatment theory of injury.   They argue that, unlike other citizens, they cannot effectively lobby the legislature to change this tax law because the change would violate the state constitution.   It is not clear to me that this unequal-ability-to-lobby injury states anything other than a "generalized grievance."   Regardless, the plaintiffs did not plead any intent to lobby.   So I would reject this theory as insufficiently pleaded.   And because the lack of standing deprives us of jurisdiction, I respectfully dissent from my colleagues' decision to reach the merits.

I

Under the federal tax code, States may allow parents to invest money in state-specific "529 plans" (named after the relevant code section) to help pay for their children's education. 26 U.S.C. § 529.   Many States have adopted these programs.   Michigan created its version in the

No. 22-1986                  *Hile, et al. v. Michigan, et al.*                  Page 18

Michigan Education Savings Program Act.  2000 Mich. Pub. Acts 454–61 (Act No. 161) (codified at Mich. Comp. Laws §§ 390.1471–.1486).  The Michigan Education Savings Program operates like a "Roth Individual Retirement Account" because parents may invest in a range of funds and have their investments "grow, federal tax-free" until they use the funds on "qualified higher education expenses."  Compl., R.1, PageID 8.  Michigan also allows state taxpayers to deduct contributions into (or distributions out of) 529 plans from their *state* "taxable income" up to certain amounts.  *Id.*  For a withdrawal to qualify for this state tax deduction, though, it must count as a "qualified withdrawal"—that is, one used "to pay the qualified higher education expenses of the designated beneficiary[.]"   Mich. Comp. Laws  §§ 206.30(1)(t)–(u), 390.1472(m)–(n).

The qualifying expenses have changed over time.  Historically, the federal tax code allowed parents to use 529 plans only on *college* expenses.  Compl., R.1, PageID 9.  In 2017, however, Congress expanded the program to allow parents to use plan funds on *elementary or high-school* tuition.  26 U.S.C. § 529(c)(7); Tax Cuts and Jobs Act, Pub. L. No. 115-97, tit. I, § 11032(a), 131 Stat. 2054, 2081–82 (2017).  The plaintiffs here—five sets of Michigan parents and an entity suing on behalf of its members (collectively, the "Parents")—seek to take advantage of this change by using their 529 plans on their children's religious-school tuition. Compl., R.1, PageID 6–7.

The Parents did not interpret Michigan statutory law as posing any obstacle to this use. Michigan law defines the "qualified higher education expenses" on which parents may spend their plan funds to mean "qualified higher education expenses as defined in section 529 of the internal revenue code."  Mich. Comp. Laws § 390.1472(m).  Given the state law's cross-reference to federal law, the Parents believed that the state law automatically expanded the eligible expenses when Congress amended § 529 to cover children's religious elementary or high-school tuition (which I will simply refer to as "religious-school tuition").  Compl., R.1, PageID 6–7.

To the Parents' chagrin, Michigan refused to allow this use of the funds.  Michigan officials asserted that taxpayers who use 529 plans for religious-school tuition must pay state taxes on the money.  Why?  According to the Parents, the officials decided that the Michigan

Education Savings Program Act violated a provision of the Michigan Constitution when applied
to religious-school tuition.  Compl., R.1, PageID 9–10.  The provision (Article VIII, § 2) states in
relevant part:

> No public monies or property shall be appropriated or paid or any public credit
> utilized, by the legislature or any other political subdivision or agency of the state
> directly or indirectly to aid or maintain any private, denominational or other
> nonpublic, pre-elementary, elementary, or secondary school.  No payment, credit,
> tax benefit, exemption or deductions, tuition voucher, subsidy, grant or loan of
> public monies or property shall be provided, directly or indirectly, to support the
> attendance of any student or the employment of any person at any such nonpublic
> school or at any location or institution where instruction is offered in whole or in
> part to such nonpublic school students.

Mich. Const. art. VIII, § 2.

The Parents sued the State, its governor, and its treasurer to challenge this provision.
They alleged four counts.  First, they argued that the provision violated the Free Exercise Clause
because, like Blaine Amendments of old, it grew out of anti-Catholic animus.  Compl., R.1,
PageID 26–28; *cf. Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2268–74 (2020) (Alito,
J., concurring).   Second, they asserted that the provision violated the Free Exercise Clause
because it favored nonreligious schools.  Compl., R.1, PageID 28–29.  Third, they asserted that
the provision violated the Free Exercise Clause because it required religious schools to give up
their religious status.  *Id.*, PageID 30–31.  Fourth, they asserted that the provision violated the
Equal Protection Clause because it forced religious individuals to amend the state constitution to
receive state aid, whereas other groups needed only to convince legislators for that aid.  *Id.*,
PageID 32–33.  As their remedy, the Parents sought a declaration that the ban violated the Free
Exercise and Equal Protection Clauses and an injunction barring state officials from enforcing it.
*Id.*, PageID 34.

In a motion to dismiss, the Michigan officials asserted that the Parents misinterpreted the
Michigan Education Savings Program Act.  Even if the state constitutional provision did not
exist, the officials argued, this state statutory law would not permit the Parents to use their 529
plans on religious-school tuition.  The officials justified this state-law reading with a deep dive
into § 529's text.  One subsection of § 529 has long exempted "any distribution" out of a 529

plan from a party's *federal* gross income if spent on "qualified higher education expenses." 26 U.S.C. § 529(c)(1), (3)(B)(ii).  Congress permitted spending on elementary and secondary education by changing the definition of "qualified higher education expense" for "this subsection"—namely, § 529(c).  *Id.* § 529(c)(7).  According to the Michigan officials, then, this expansion applied *only* to the subsection creating a *federal*-income exemption.  And § 529 elsewhere defines "qualified higher education expenses" to cover only college expenses.  *See id.* § 529(e)(3), (5).  The officials thus read Michigan law to cross-reference § 529(e)'s general college-focused definition.

The Parents offered a strong response.  For starters, Michigan law defines "qualified higher education expenses" to mean expenses "as defined" in "section 529"—not just in § 529*(e)*.  Mich. Comp. Laws § 390.1472(m).  Before this lawsuit, moreover, Michigan had treated two other *§ 529(c)-specific* expansions of the phrase "qualifying higher education expenses" as applying to Michigan's state program.  Resp., R.22, PageID 144–47; *see* 26 U.S.C. § 529(c)(8)–(9).

Nevertheless, the district court refused to question the Michigan officials' interpretation of state law under the so-called "comity" doctrine.  Op., R.39, PageID 281–82.  This doctrine bars federal courts from issuing injunctions against state tax laws if the plaintiffs have an adequate state remedy.  *Id.*, PageID 280–81.  The court directed the Parents to state courts if they wanted to challenge the officials' reading of state law.  *Id.*, PageID 282.  The court believed that this "comity" holding barred it from reaching any of the Parents' free-exercise claims.  *Id.*  That said, the court also held that the conclusion did not "necessarily" preclude the Parents' equal-protection claim.  *Id.*, PageID 283.  If the court accepted their "political process theory," it reasoned, the Parents would suffer an "unconstitutional burden" simply from the state constitutional provision's existence—even accepting the state officials' reading of state statutory law.  *Id.*  But the court rejected this political-process theory on the merits.  *Id.*

II

The Parents' appeal has narrowed the issues before us.  They have abandoned their reading of Michigan *statutory* law.  So we must assume that this law independently bars them

from using their 529 plans on religious-school tuition unless they pay state taxes on the withdrawals.  The Parents have also abandoned their free-exercise theories.  So we must consider only their equal-protection theory that the state constitutional provision violates the Supreme Court's "political-process doctrine."  *See Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 301–314 (2014) (plurality opinion); *Washington v. Seattle School District No. 1*, 458 U.S. 457, 467–87 (1982); *Hunter v. Erickson*, 393 U.S. 385, 389–93 (1969).  My colleagues hold that the Parents have adequately alleged standing for this political-process claim but that it fails on the merits.  I disagree on the standing question and so would not reach the merits.

Article III of the Constitution limits federal courts to resolving "Cases" or "Controversies."  U.S. Const. art. III, § 2.  This text requires parties who seek recourse in federal court to have standing to sue.  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  And under the well-known test, standing requires three things.  *See id.*  The plaintiff must assert a "concrete" and "particularized" "injury" that is "actual" (meaning that it has occurred) or "imminent" (meaning that it will occur soon).  *Id.*  Next, the injury must be "fairly traceable" to the actions that the plaintiff challenges.  *Davis v. Colerain Township*, 51 F.4th 164, 172 (6th Cir. 2022) (quoting *California v. Texas*, 141 S. Ct. 2104, 2119 (2021)).  Lastly, the plaintiff's requested remedy must be "likely to redress" the injury.  *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 797 (2021).

Two procedural rules further clarify the standing framework.  For one thing, plaintiffs must plead and prove standing in the same way that they must plead and prove any other element of their claim.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  At this pleading stage, then, they must meet the "plausibility" test from *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).  *See Ass'n of Am. Physicians & Surgeons v. U.S. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021).  Contrary to the Parents' argument, courts no longer assume that a complaint's "general allegations embrace those specific facts that are necessary to support the claim."  *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  *Twombly* "retired" that test.  *Ass'n of Am. Physicians*, 13 F.4th at 543.  So the Parents must plead facts that plausibly show that they have suffered an adequate injury, that the challenged provision caused that injury, and that the requested remedy would redress it.  *See, e.g.*, *id.* at 544–47.

No. 22-1986                          *Hile, et al. v. Michigan, et al.*                          Page 22

For another thing, courts do not award standing "in gross."  *Davis*, 51 F.4th at 171 (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006)).  A plaintiff must meet the three-part standing test for every "injury" that they allege and every "remedy" that they seek.  *Id.* For example, a plaintiff cannot match a past injury with a request for an injunction because the injunction—a forward-looking remedy—will not redress the harm that already happened.  *See id.* And a plaintiff cannot leverage standing to sue over a cognizable injury (say, an injury from a municipal tax) into standing to sue over an insufficient one (say, an injury from a state tax). *Cuno*, 547 U.S. at 353.

The Parents have not met these standing rules.  Their complaint and briefing identify two injuries.  They initially argued that they cannot use their 529 plans on religious-school tuition without incurring state tax liability.  Compl., R.1, PageID 9–10.  Apart from this monetary harm, they next argue that, unlike other Michigan residents, they cannot "lobby" the state legislature to permit the use of 529 plans on religious-school tuition because the state constitution "would invalidate any favorable legislation they secured."  Reply Br. 3.  But the Plaintiffs' first harm fails standing's traceability and redressability elements, and their second harm fails its injury element.

*Injury One*.  Each group of Parents alleged in their complaint that they "have funded [a 529 plan] and would like to use it to pay for their children's private, religious-school tuition in Michigan."  Compl., R.1, PageID 6–7.  Yet they cannot do so because they will incur tax penalties if they spend plan funds on this tuition.  *Id.*, PageID 9.  This claim plausibly pleaded an Article III injury.  In fact, "monetary harms" are the "most obvious" cognizable injuries. *TransUnion*, 141 S. Ct. at 2204.  To be sure, the Parents have yet to incur this monetary injury because of their refusal to use their 529 plans in the tax-harmful way.  But Article III requires only an *imminent* injury.  *See Carney v. Adams*, 141 S. Ct. 493, 498 (2020).  And the Parents have pleaded that they are "able and ready" to use their 529 plans for religious-school tuition. *Ne. Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).  So the Michigan officials' "threat of enforcement" of the state tax laws suffices to create this imminent injury.  *MedImmune, Inc. v. Genetech, Inc.*, 549 U.S. 118, 129 (2007).

That said, this injury theory flunks the "next two standing elements" because the Parents accept the Michigan officials' reading of state statutory law on appeal. *Outdoor One Commc'ns, LLC v. Charter Township of Canton*, 2021 WL 5974157, at *2 (6th Cir. Dec. 16, 2021). That reading means that the Parents' monetary injury does not flow out of the Michigan Constitution. It instead flows out of the narrow definition of "qualifying higher education expenses" in the Michigan Education Savings Program Act. A "mismatch" thus exists between the cause of the Parents' injury and the provision they challenge. *Davis*, 51 F.4th at 172. Or, if we consider this question from the perspective of redressability, an injunction against the state constitution would not remedy their tax injury. Even if they obtained that injunction, they could not use their 529 plans on religious-school tuition. That use would still trigger the state law's tax penalty. Because "injunctive relief could amount to no more than a declaration that the [state] provision they attack is unconstitutional," this relief does not create a live case. *California*, 141 S. Ct. at 2116.

*Injury Two*. I thus find it unsurprising that the Parents' appellate briefing falls back on a different injury. They argue that the challenged constitutional provision injures them by barring them from "lobby[ing] the Michigan Legislature" to amend state law and allow them to use their 529 plans in the way they prefer. Reply Br. 3. I am skeptical that this theory could ever show an Article III injury. Admittedly, the Supreme Court has made clear that "intangible harms"—such as a state restriction on a person's ability to speak—qualify as "concrete" injuries. *TransUnion*, 141 S. Ct. at 2204. But the challenged constitutional provision does not restrict the Parents' ability to "lobby" (that is, to speak) in any way. It just deprives them of the practical incentive to do so because they believe that the hoped-for statutory change would violate the state constitution.

Besides, the Parents do not allege a *speech* injury. They allege an *equality* injury. Michigan citizens who want Michiganders to be able to use 529 plans on religious-school tuition can achieve this objective only by first amending the state constitution and then convincing the state legislature to pass a law permitting this result. Yet other citizens who want the state government to adopt many other policies can skip the first step and need only convince the

legislature to pass a law.  This unequal treatment, the Parents claim, qualifies as a concrete injury that gives them standing to challenge the state constitutional ban on religious-school funding.

I agree that the "denial of equal treatment" can qualify as a concrete "injury in fact" for standing purposes.  *Ne. Fla. Chapter*, 508 U.S. at 666.  So, for example, government contractors can suffer an Article III injury when they are disadvantaged by the "preferential treatment" that a city gives to "minority-owned businesses" in its contracting—even if the disadvantaged contractors may still lose out on the city contract under a level playing field.  *Id.* at 658, 666; *see Vitolo v. Guzman*, 999 F.3d 353, 359 (6th Cir. 2021).  And college applicants can suffer an Article III injury from a university's racially discriminatory admissions policy—even if they may still get rejected under a race-neutral policy.  *Gratz v. Bollinger*, 539 U.S. 244, 260–62 (2003).

But I am dubious that this caselaw extends to the Parents' claimed injury.  In each case, the unequal treatment made it more difficult for the challengers to obtain a *particularized* benefit—whether the award of a government contract or the admission into a university.  Here, by contrast, the Parents seek a level playing field in their ability to have the legislature pass a "generally applicable [Michigan] law" that would apply just as much to them as to everyone else.  *Hollingsworth v. Perry*, 570 U.S. 693, 706 (2013).  So this unequal-treatment theory might trigger the traditional rule that parties do not have standing to raise "generalized grievances" unconnected to particularized injuries unique to them.  *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per curiam); *see, e.g.*, *Carney*, 141 S. Ct. at 499; *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *Ex parte Levitt*, 302 U.S. 633, 633 (1937) (per curiam); *Massachusetts v. Mellon*, 262 U.S. 447, 486–88 (1923).  For instance, the Court has often held that a State's residents cannot seek to *defend* the State's "generally applicable" law in court because they have only a generalized interest in that state law.  *Hollingsworth*, 570 U.S. at 706; *Diamond v. Charles*, 476 U.S. 54, 64–67 (1986).  If that is true, I would think that the Parents here likewise assert only a generalized interest when they seek to *enact* a generally applicable state law.

If anything, the Parents' argument could all but make "meaningless" the ban on generalized grievances.  *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2100 (2019) (Gorsuch, J., concurring in the judgment).  If they are right, wouldn't *any* party who wants a legislature to enact a law on a topic that the state constitution prohibits suffer a cognizable

No. 22-1986                     *Hile, et al. v. Michigan, et al.*                     Page 25

unequal-treatment injury that allows the party to challenge the constitutional provision? Michigan's Constitution removes many topics from the legislative process.   To list two examples, a Michigan resident has the "right to keep and bear arms for the defense of himself and the state," Mich. Const. art. I, § 6, and the right "to reproductive freedom," including the right to obtain an abortion in certain circumstances, *id.* art. I, § 28.   Can citizens litigate a challenge to the state constitutional right to bear arms simply because they would like their legislature to ban guns?   Or can citizens litigate a challenge to the right to reproductive freedom simply because they would like their legislature to ban abortions?

All of this said, I can leave this broader issue for another day.   Even assuming the validity of this theory, parties alleging an unequal-treatment injury still must show that they are "able and ready" to engage in the activity in which they fear discriminatory treatment.   *Carney*, 141 S. Ct. at 500 (quoting *Gratz*, 539 U.S. at 262).   So, for example, a lawyer who was affiliated with no political party lacked standing to challenge a state constitutional provision reserving state judgeships to members of the main two political parties because he failed to show that he was "able and ready" to apply for a judgeship.   *Id.* at 499–503.   Conversely, a college applicant established his standing to challenge a university's discriminatory admissions policy because he showed that he was "able and ready" to reapply for admission as a transfer student after the university had denied his initial application.   *Gratz*, 539 U.S. at 261–62.

The Parents have not satisfied this test.   At this pleading stage, they must allege facts that plausibly show that they are "able and ready" to lobby the Michigan legislature to change Michigan law so they can use their 529 plans for religious-school tuition.   *See Ass'n of Am. Physicians*, 13 F.4th at 543–44.   But their complaint alleged nothing of the sort.   The Parents do not allege any "concrete plans" to undertake any specific lobbying activity—whether writing their state representatives or participating in an assembly at the statehouse.   *Lujan*, 504 U.S. at 564.   Indeed, they do not even allege the sort of "'some day' intentions" that the Court has repeatedly held do not suffice.   *Carney*, 141 S. Ct. at 502 (quoting *Lujan*, 504 U.S. at 564). Instead, their complaint has alleged only that they want to use their 529 plans for their children's religious-school tuition.   In my view, that allegation alone does not plausibly show that the Parents would decide to get involved in politics in order to achieve this goal.

Nor do the Supreme Court's three political-process cases help the Parents' standing theory.  Most obviously, the Court did not discuss standing in any of the cases.  *See Schuette*, 572 U.S. at 298–315 (plurality opinion); *Seattle*, 458 U.S. at 459–87; *Hunter*, 393 U.S. at 386–93.  While a standing problem creates a jurisdictional issue that courts have a duty to raise on their own, decisions like these that resolve constitutional issues on the merits do not create binding precedent on standing questions that they (perhaps wrongly) overlooked.  *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998); *Lewis v. Casey*, 518 U.S. 343, 352 n.2 (1996).

Besides, any (implied) finding that standing existed in these three cases would not establish the Parents' standing in this case.  First consider *Hunter*.  Nellie Hunter sought to buy a home in Akron, Ohio, but a real-estate agent refused to show her several houses because their owners would not sell to African Americans.  393 U.S. at 387.  Akron's city council had passed an antidiscrimination ordinance that barred racial discrimination in housing.  *Id.* at 386.  The ordinance delegated enforcement authority to a commission in the mayor's office and allowed parties to file complaints with the commission.  *Id.*  Hunter filed a complaint.  *Id.* at 387.  In the meantime, Akron residents voted on a city charter amendment to bar its council from enacting antidiscrimination ordinances unless a majority of residents approved.  *Id.*  So the commission responded to Hunter's complaint by noting "that the fair housing ordinance was unavailable" to her.  *Id.*  Hunter sued the mayor in state court seeking a "writ of mandamus" to require him to order his commission to process her complaint.  *Id.*  Hunter's inability to obtain the home of her choice likely counted as an Article III injury—just as the Parents' inability to use their 529 plans on religious schools counts as one.  Unlike in this case, however, Hunter's suit likely would have redressed this injury.  An injunction against the charter amendment would have led the commission to enforce Akron's antidiscrimination ordinance against the homeowners who refused to sell to Hunter.  Here, by contrast, an injunction against the state constitutional provision would not redress the Parents' injuries.  Unlike the ordinance in *Hunter*, Michigan statutory law independently bars the use of plan funds on religious schools.

Or consider *Seattle*.  There, a Seattle school district enacted a plan requiring some students to bus to schools farther away from their homes in order to reduce the district's de facto

segregation.  458 U.S. at 461.  The State of Washington's citizens responded with an initiative that generally barred school districts from forcing students to attend the school that was not closest to them.  *Id.* at 462–64.  Along with two other districts, the Seattle district sued the State in federal court to challenge this initiative.  *Id.* at 464.  It is not clear how the districts had standing.  Perhaps the Court thought they could vindicate their "sovereign interests" as public bodies.  *Cf. Saginaw County v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 956–59 (6th Cir. 2020).  But the Court has long concluded that municipalities cannot sue their States over constitutional violations.  *See Hunter v. Pittsburgh*, 207 U.S. 161, 178 (1907).  So at least one court has held that *Seattle* says nothing about standing when it reaffirmed that municipalities lack standing to assert constitutional challenges against state laws.  *See Burbank-Glendale-Pasadena Airport Auth. v. City of Burbank*, 136 F.3d 1360, 1362–63 (9th Cir. 1998); *see also City of San Juan Capistrano v. Cal. Pub. Utils. Comm'n*, 937 F.3d 1278, 1280–81 (9th Cir. 2019).  Be that as it may, I fail to see how a political subdivision's ability to vindicate its busing plan says anything about the Parents' ability to sue.

Lastly consider *Schuette*.  In that case, some Michigan universities had historically given a preference to minorities in their admissions process.  572 U.S. at 298.  But Michigan's citizens passed a constitutional amendment requiring universities to treat all applicants equally no matter their race.  *Id.* at 299.  Although a broad coalition of entities, students, faculty, and applicants challenged this equal-protection amendment on equal-protection grounds, *id.* at 299–300, only one plaintiff needed to have standing under the Supreme Court's standing test, *see Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023); *cf. Coal. to Defend Affirmative Action v. Regents of Univ. of Mich.*, 539 F. Supp. 2d 924, 945–47 (E.D. Mich. 2008).  And the minority applicants' inability to get into a university of their choice would likely qualify as an Article III injury—again like the Parents' inability to use their 529 plans on religious schools.  As in *Hunter*, however, an injunction against the constitutional provision in *Schuette* would have resuscitated the universities' race-conscious policies.  *See Coal. to Defend Affirmative Action*, 539 F. Supp. 2d at 946.  Here, by contrast, an injunction would leave the statutory law that separately bars the Parents' preferred course of action.

No. 22-1986                    *Hile, et al. v. Michigan, et al.*                    Page 28

* * *

At day's end, my disagreement with my colleagues' standing analysis does not necessarily mean that I disagree with them on the merits of the Parents' political-process claim. But "[i]t is emphatically the province and duty of the judicial department to say what the law is" *only* when necessary to resolve a "particular" case. *Marbury v. Madison*, 5 U.S. 137, 177 (1803). Because the Parents have not presented their constitutional theory in a justiciable form, I would dismiss their suit without prejudice for lack of jurisdiction. So I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-1986

JILL HILE; SAMANTHA JACOKES; PHILLIP
JACOKES; NICOLE LEITCH; MICHELLE
LUPANOFF; GEORGE LUPANOFF; PARENT
ADVOCATES FOR CHOICE IN EDUCATION
FOUNDATION; JOSEPH HILE; JESSIE BAGOS;
RYAN BAGOS; JASON LEITCH,

     Plaintiffs - Appellants,

     v.

STATE OF MICHIGAN; GRETCHEN WHITMER,
Governor, in her official capacity; RACHAEL
EUBANKS, Michigan Treasurer, in her official
capacity,

     Defendants - Appellees.

> **FILED**
> Nov 06, 2023
> KELLY L. STEPHENS, Clerk

Before:  STRANCH, BUSH, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens, Clerk